ANCIL C. HALL *v.* ROSWELL BOWKER; J. C. WEBSTER, TRUS-
TEE; AND THE NATIONAL BANK OF NEWBURY, AND THE FIRST
NATIONAL BANK OF ST. JOHNSBURY, CLAIMANTS.

*Trustee Process. Negotiable Paper. Banks. Statutes, § 47,*
*ch. 34, Gen. Stats.*

The statute, § 47, ch. 34, Gen. Stats., which provides " that any negotiable paper which
shall be actually assigned, negotiated and transferred to any bank in this State before
it becomes due, shall become exempt from attachment by the trustee process," is under-
stood to mean that the fact of such transfer before the negotiable paper becomes due
has the effect to exempt the paper from the process, and that in this respect it makes
no difference whether previous to such transfer process had been served that would hold
the debt if the paper had not been transferred to the bank, where the bank discounted
the paper in good faith in the ordinary course of business without knowledge of the
pendency of the trustee process.

TRUSTEE PROCESS.   The National Bank of Newbury and the First National Bank of St. Johnsbury severally appeared as claimants.   A commissioner was appointed to take the disclosure of the trustee, and to hear and examine testimony, &c., in accordance with the General Statutes, chapter 34.   The commissioner made his report at September term, 1870, and thereupon the court, PECK, J., presiding, *pro forma*, rendered judgment that the trustee is chargeable, to which said banks, as such claimants, were allowed to except, and their exceptions were allowed.

The commissioner reported as follows:

"That on the 25th of January, 1867, the trustee gave the principal debtor four notes for nine hundred and sixty dollars each; two of which were paid before the service (August 14th, 1868,) of this process.   The two remaining ones are still unpaid, except as to eighty dollars, which was paid June 16th, 1868.   One of the two last mentioned notes was due March 1st, 1870, and the other one March 1st, 1871, and both with interest annually, after March 1st, 1867.   I therefore find due on each of those notes the sum of eleven hundred and thirty-four dollars and twenty-five cents ($1,134.25), both amounting to $2,268.50, which sum I find in the hands of the trustee, for which he should be held liable to the plaintiff unless the court shall decide that the same belongs to the claimants upon the following facts.   I have computed interest up to the third Tuesday of September, 1870.

On the 30th day of September, 1867, the defendant borrowed a large sum of money of William H. Cummings, of Lisbon, N. H., and turned these two notes out to him as collateral security for the same, and they remained in his hands until transferred to the claimants as hereinafter detailed.

At or near the time the notes were transferred to Cummings, he requested the principal debtor (Bowker) to notify the trustee that the notes had been thus transferred.   About the first of October, 1867, the trustee went to Lisbon village, N. H., (where the said Cummings and Bowker resided,) with five or six hundred dollars to pay on the notes, and Bowker then told him he had put, or made arrangements to put, the notes into a bank as collateral security, but did not tell him what bank, and no money was paid at that time.   Again, on the 16th of June, 1868, the trustee went to Lisbon village with $80 to pay on the notes.   Bowker then told him he had not the notes by him, but would get them in a few moments.   He then stepped out into the village and soon returned and told the trustee he could not get them.   All that

Hall *v.* Bowker, trustee and claimants.

appeared to show what the trustee understood by this is his state-
ment in his disclosure hereto annexed, which was as follows: "I
understood that he owned the notes, but that they were with
another man." The trustee paid the $80 and took Bowker's re-
ceipt for it. A day or two after November 9th, 1868, the trustee
received a letter from Cummings, which is hereto annexed and
marked "B." Also afterwards, one dated November 19th, 1868,
a copy of which I annex and mark "C," to which the trustee re-
plied by letter dated November 24th, 1868, a copy of which is
annexed and marked "D." The trustee never received any notice
from Cummings that the notes had been transferred to him ex pt
what I have detailed.

Some time before the 16th day of September, 1869, and after
he had heard that this trustee process was pending, Cummings not
knowing whether he could prove notice to the trustee of the trans-
fer of the notes to him, and wanting to raise money on them, he
made some investigation to see what the effect would be to nego-
tiate the notes to a bank, and on consulting counsel he concluded
that if he failed in his proof of notice, the notes would be good in
the hands of a bank, and on said 16th day of September, 1869, he
got one note discounted at the bank of one of the claimants, viz: the
National Bank at Newbury, Vt. The note was discounted in the
ordinary manner of doing business at that bank. Cummings re-
ceived for the note $1,113.71, and endorsed the same, waiving
demand and notice. The bank had no knowledge of the existence
of this trustee process, nor did Cummings inform them of it, but
did say to the cashier that he had better notify the trustee that
the note had been transferred to the bank, which he did by letter
dated September 16th, 1869.

On the first day August, 1870, Cummings transferred the other
of said two notes to the First National Bank of St. Johnsbury,
Vt., the other claimant, for $1,154.58. It is agreed by the par-
ties that the character of the transfer of this note is the same as
that of the other note to the Bank of Newbury. Soon after the
transfer of the note to the First National Bank of St. Johnsbury,
the trustee received from them notice when the note would fall
due.

If the court, from the foregoing facts, decide that the claimants
are entitled to the funds in the hands of the trustee, then I find
they are each entitled to the sum of $1,134.25."

The letter from W. H. Cummings to said Webster, and re-
ferred to in the report, marked "B," contained a notice that he,

Cummings, held the notes, which were described in the letter ; and the letter stated that he had heard that Webster had been trusteed by a creditor of Mr. Bowker. The letter was dated November 9, 1868.

The letter marked " C " was in reference to said notes, and the trustee process, and as to what the law was as to notice, &c. The letter marked " D " was Mr. Webster's reply to Mr. Cummings's letter, but contained nothing material to be here stated.

*Ossian Ray*, for the plaintiff, maintained that a *fair* and *reasonable* construction of the proviso to section 47, pages 312, 313, Gen. Stats., indicates that *only* such negotiable paper is exempted from attachment as has been assigned, negotiated and transferred *before the service of the writ*. The phrase, " shall become exempt from *attachment* by the trustee process," found in the proviso, when taken in connection with the preceding portion of the same section, imports an attachment made *subsequent* to the sale of a demand to a bank. This is the more *just* and *equitable* construction. It harmonizes more completely with the rest of that section, and also of section two of the same chapter. It is more pointedly sustained than any other view, by the *language* of these sections. This interpretation of the law affords all the protection to the banks that they deserve. Any other view opens wide the door to fraud and knavery. He cited, as to the rules of construction of statutes, 2 Rol., 127 ; *Archer* v. *Bokenham*, 11 Mod., 161 ; 1 Institutes, 381 ; Dwarris on Statutes, 80, 81 ; *Reniger* v. *Fogano*, Plow., 13 ; *Rex* v. *Lamb*, 5 T. R., 76 ; *Rex* v. *Neale*, 8 T. R., 241.

*William Heywood*, for the claimants, cited Story on Prom. Notes, § 178, and cases cited in note 3 ; Drake on Attachment, §§ 223, 58, 584, 585 ; *Hutchins* v. *Hawley*, 9 Vt., 585 ; *Burke* v. *Whitcomb*, 13 Vt., 421 ; *Weller* v. *Weller*, 18 Vt., 55—see page 61 ; Gen. Stats., ch. 80, §§ 5, 6 ; *Britton* v. *Preston*, 9 Vt., 263.

The history of the liability of negotiable promissory notes to be taken by the trustee process is, that under the statute of 1797 it was held that because, by the proviso of that law, it was pro-

vided that the maker of a note might have all such defenses against an endorsee as he could in the hands of the original payee, therefore such note could be held by the trustee process until the note should be negotiated and actual notice given. But after the act of 1836, which repealed the proviso, then it was held that such a note was not liable to the trustee process. *Hinsdill* v. *Safford*, 11 Vt., 309 ; *Little* v. *Hale*, 11 Vt., 482; *Ayott* v. *Smith*, 4 Vt., 532.

By the act of 1841 the legislature made negotiable promissory notes liable to the trustee process unless the note should be negotiated and notice given to the maker or endorser before the service of the trustee process on him. Then, by the act of November 3, 1852, it was provided that " any negotiable paper which shall be actually assigned, negotiated, or transferred before it becomes due shall be exempt from attachment by the trustee process, if such paper shall be discounted at any bank in this State." Under this act, in the case, *Bank* v. *Drury*, 35 Vt., 469, it was held that the note must be *discounted* by the bank, to come within the proviso, and that to take it as collateral security would not be sufficient. The Gen. Stat., ch. 34, § 47, alters this, so that it is now sufficient that the note should be actually assigned, negotiated, and transferred to any bank in this State before it becomes due, in order to exempt it from the operation of the trustee process, leaving out the word " discounted," which was in the act of 1852.

The object of the proviso to the act now in force is to relieve the commercial community from the " clog upon the negotiability of paper," so far as the banks were concerned. It provides that " any negotiable paper, which shall be actually assigned, negotiated, and transferred to any bank in this State before it becomes due, shall become exempt from attachment by the trustee process." It would be no great favor to a bank to exempt the bank from the necessity of giving notice to the maker of the note in order to hold it from future process, and to say that it shall be held on every process that was served before it was negotiated to the bank. The mere writing and mailing a notice is of no consequence to a bank, but the thing that is of consequence is to know that all negotiable paper that they take in the way of business

11

before it becomes due, will indubitably be good in their hands. This, and nothing else, will remove the " clog upon the negotiability of paper."

There is no doubt that as the statute literally reads, these claimants are entitled to hold the notes. The banks took and discounted the notes before they were due. And there is this further fact in their favor — that Cummings, who passed the notes to the claimants, actually had the title to them before the service of the trustee process. When they were discounted by the banks it made their title good without notice, because when negotiated to a bank no notice is required. If it should be said that Cummings procured these notes to be discounted with the intention to avoid the trustee process, our answer is that he had a right to do so, and such intention would not alter the case. *Wood* v. *Bodwell*, 12 Pick., 268 ; *Robinson* v. *Hall*, 3 Met., 301 ; *Barnard* v. *Graves*, 16 Pick., 41.                                  ,

The opinion of the court was delivered by

BARRETT, J. It is assumed, upon the facts reported, that the claimant banks discounted and received the notes in question in good faith. It is found that it was done in the ordinary manner of doing business at the banks, and that the banks had no knowledge of the existence of the trustee process. The notes were underdue at the time of the discount, and payable to Bowker or bearer. In the hands of Cummings and as against him the notes were subject to the trustee process, by reason of notice not having been given by him to Webster of the transfer of the notes to him before the service of that process. After the service of such process Cummings got the notes discounted, and with his endorsement transferred them to the banks. The question is, Can they be held under that process as against the banks ?

It is to be noticed that neither Cummings nor the banks were party to the trustee suit. It is also to be noticed that the process does not designate or indicate in what the " goods, effects or credits " of the defendant in the hands of the alleged trustee consist, either in substance or form. They may be anything falling within the meaning of any or all of those terms, and answer the exigency

of the process. It could hardly be, and indeed it is not really claimed, that the banks should or can be affected by any of the doctrines of *lis pendens*. The case as to the banks, then, must rest upon the construction and application of the statute.

The subjection of current commercial paper to the trustee process is in derogation of the common commercial law which insures for such paper the freest and most unembarrassed circulation for business purposes. Upon general considerations, therefore, no countenance is found for giving our peculiar statutes in this behalf any broader construction and effect than their terms and obvious purpose require. At the same time it seems obvious that the statute itself indicates that its provisions as to current paper were designed to be specific and precise, and to make the plain and direct import of the language the very rule of the subject. It is not our purpose to discuss questions of policy involved in such innovations upon the settled body of commercial law, but only to state the meaning and application of the statute to the subject in hand.

It may be remarked that the matter of reaching " the goods, effects and credits " of a debtor by trustee process is not of natural, inalienable right, to which all creditors are born in Vermont : but is altogether a matter of specific and arbitrary statute, and that statute prescribes just what, and under what conditions, and in what way certain specified things may be thus reached.

Among other things, it provides as to the reaching of promissory notes by the creditors of the payee, and therein provides that under certain conditions they may be thus reached, though in fact negotiated and held *bona fide* by persons who have paid full value for them. In that class of cases it is the right of the creditor to avail himself of the law in that behalf. The trustee in the present case would have been held by this process, if the notes given by him to the principal debtor had remained in the hands of Cummings, to whom the debtor transferred them for value, or had not gone into the hands of banks ; because the case would then have fallen within the conditions of the statute to that effect. But the same statute, in the same section and immediately following in the next clause, provides " that any negotiable paper which shall be

actually assigned, negotiated, and transferred to any bank in this State before it becomes due, shall become exempt from attachment by the trustee process." We understand this to mean that the fact of such transfer has the active operation of exempting the paper from the process, and that in this respect it makes no difference whether, previous to such transfer, process had been served that would hold the debt if the paper had not been transferred to a bank. This is the plain import of the language. It is also in the accomplishment of the obvious ideas of policy entertained by the legislature, viz: to enable banks to take current negotiable paper in the usual course of their business, without the hazard of being trapped by some lurking process in which the terms " goods, effects and credits " might cover and hold such paper in the hands of others besides banks.

What is thus said, sufficiently for the present purpose, indicates the leading idea of this court.

The judgment is reversed, and judgment that the trustee be discharged, claimants to be allowed costs since filing their claim.